IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION

| | |
|---|---|
| QUY TRIEU LAM, <br><br> Petitioner, <br><br> vs. <br><br> KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID O'NEILL, DIRECTOR, PHILADELPHIA ICE FIELD OFFICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PAMELA BONDI, ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE; AND LEONARD ODDO, WARDEN, MOSHANNON VALLEY PROCESSING CENTER; <br><br> Respondents. | Civil Action No. 3:25-cv-00397 <br><br><br> United States Magistrate Judge <br> Christopher B. Brown |

**MEMORANDUM OPINION**[1]

**Christopher B. Brown, United States Magistrate Judge**

Presently before the Court is a counseled petition for a writ of habeas corpus under 28 U.S.C. § 2241 filed on behalf of Petitioner, Quy Trieu Lam ("Lam"), an immigration detainee, who at the initiation of this matter, was held at the Moshannon Valley Processing Center, an immigration detention center located in

---

[1]   All parties have consented to full jurisdiction before a United States Magistrate Judge, including entry of a final judgment, under 28 U.S.C. § 636(c).  *See* ECF Nos. 6 and 9.

1

the Western District of Pennsylvania.[2] Respondents have notified him they intend to remove him to Vietnam. He contends (1) there is no significant likelihood he will be removed to Vietnam in the reasonably foreseeable future and (2) Respondents' failure to comply with procedural requirements for revoking immigration-related supervised release entitles him to be returned to supervised release status. ECF No. 1 at 9-11. For the reasons stated below, the petition will be granted and Respondents will be ordered to release Lam from custody, subject to and in accordance with the conditions of his preexisting Order of Supervision.

I.     **Relevant Background**

   A.     **Lam's Background**

Lam was born in 1971 in Vietnam during the Vietnam War. ECF No. 1, ¶¶1, 12; ECF No. 1-1, ¶1. When he was six years old, with his family, he fled Vietnam and lived in refugee camps. ECF No. 1, ¶¶ 1, 12. In March 1981, at age 10, he was admitted to the United States as a stateless refugee. *Id.*, ¶¶ 2, 13. He became a lawful permanent resident of the United States in 1983. *Id.*, ¶ 1; ECF No. 10-1, ¶ 5.

In 1992, Lam was convicted in Kings County Supreme Court in New York of Grand Larceny and two counts of Robbery and was sentenced to a term of imprisonment of four to twelve years incarceration. ECF No. 1-1, ¶ 10; ECF No. 10-1, ¶ 6. Based on those convictions, on April 8, 1998, a Notice to Appear was issued

---

[2]     Lam has since been transferred to the Miami Correctional Center in Indiana. ECF No. 3. This transfer does not divest this Court of jurisdiction. *See Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 448 (3d Cir. 2021).

charging Lam with removability under 8 U.S.C. § 1227 as an alien convicted of an aggravated felony. *Id.*, ¶ 7. Lam was released from incarceration for his criminal convictions on August 9, 2000. *Id.*, ¶ 8. Fifteen months later, on November 13, 2001, Lam was ordered removed by an Immigration Judge. ECF No. 1-2. He waived appeal, and the parties agree the order of removal is administratively final. Vietnam was designated as the country of removal for Lam; however, immigration authorities could not carry out Lam's removal because at that time no repatriation agreement existed between the United States and Vietnam for individuals who had left Vietnam before 1995. ECF No. 1, ¶ 16; ECF No. 1-1, ¶ 6. Lam was released from immigration detention on March 5, 2002, under an order of supervision ("OSUP") with instructions to report in person to INS offices in New York on the first day of each month. ECF No. 1-3. It appears at some point Lam's reporting requirements later changed from monthly to every one to three months. ECF No. 1-5 at 2.

Although Lam cooperated with immigration authorities for over twenty-three years, on September 22, 2025, he was detained during a routine immigration check-in appointment without any prior warning and served with a Notice of Revocation of Release. ECF No. 1, ¶ 19. According to the Notice, Lam's OSUP was revoked due to a "determination that there are changed circumstances in your case, specifically that ICE is acquiring a travel document on your behalf and your removal is now imminent." ECF No. 10-2 at 2.

3

Lam has lived in the United States continuously for nearly his entire life. ECF No. 1-1, ¶ 2. He and his family arrived in the United States with no documents. ECF No. 1-1, ¶ 4. "The Vietnamese government has never recognized [him] as a citizen. [He has] no family, connections, or identity to Vietnam." ECF No. 1-1, ¶ 5. He is married to a U.S. citizen and has a U.S.-born teenage son. *Id.*; *see also* ECF No. 1, ¶ 21. He is the sole caregiver for his elderly parents, who depend on him for their daily care. ECF No. 1-1, ¶ 9.

### B. 2020 Memorandum of Understanding

"Vietnam has long refused to accept for deportation Vietnamese nationals who came to the United States as refugees before 1995." *Nguyen v. Scott*, 796 F. Supp. 3d 703, 714 (W.D. Wash. 2025). On November 21, 2020, the United States and Vietnam entered into a Memorandum of Understanding (the "2020 MOU") regarding "the acceptance of the return of Vietnamese citizens who arrived in the United States before July 12, 1995 and who have been ordered removed from the United States." ECF No. 10-3 at 2. The purpose of the 2020 MOU is "to establish a process of review and issuance of travel documents for Vietnamese citizens ordered removed from the United States and to facilitate the acceptance of all such Vietnamese citizens[.] . . . The scope of this MOU is intended to apply to individuals who arrived in the United States before July 12, 1995." *Id.*

Section 4 of the 2020 MOU, entitled "Eligibility for Acceptance of Return," states Vietnam intends to accept the removal of individuals who meet four conditions:

4

> "1. Has Vietnamese citizenship and does not have citizenship of any other country at the same time;
>
> "2. Has violated U.S. law and has been ordered removed by a U.S. competent authority (and, if sentenced to a prison term, the individual must have completed any term of imprisonment before removal or a U.S. competent authority must have ordered a reduction in the sentence or the individual's release from prison);
>
> "3. Resided in Viet Nam prior to arriving to the United States and currently has no right to reside in any other country or territory."
>
> 4. [REDACTED][3]

*Id.* at 3-4. Sections 5 and 6 of the MOU contain factors that the United States intends to consider before requesting travel documents for a Vietnamese citizen and that Vietnam intends to consider before accepting an individual ordered removed. *Id.* at 4. These factors are also redacted and have not been disclosed in this litigation. And Section 8 is titled "Procedures for Verification and Issuance of Travel Documents." *Id.* at 5-6. Under Section 8, ICE must request appropriate travel documents from Vietnamese officials before removal. *Id.* at 5, ¶ 1. The documentation package is expected to contain a cover letter, the self-declaration form, a copy of the individual's final order of removal, copies of records related to the individual's criminal convictions and incarceration, if applicable; photographs and fingerprints, and copies of citizenship documents such as expired passports, national identity cards, birth certificates, or expired travel documents. *Id.*, at 5, ¶ 2.

---

[3] The fourth mandatory condition is redacted and Respondents have not disclosed any information about what that condition requires.

5

After the request for a travel document is received, Vietnam "intends to issue the travel document" within thirty days "when the individual meets the eligibility criteria listed in Section 4 of this MOU." *Id.*, ¶ 3.  For individuals who do not meet the eligibility criteria, the MOU sets out a process through which the United States and Vietnam will try to "resolve the case," which may include gathering additional information, convening a working group, considering "the humanitarian and family unity factors of the individual ordered removed," and conducting interviews.  *Id.*, ¶¶ 4–7.

    C.    **Lam's 2025 Re-Detention**

The record before the Court suggests that since his August 9, 2000 release from incarceration, Lam has received no further criminal convictions and has remained fully compliant with his OSUP terms.  *See* ECF No. 1-1, ¶ 6.  Most recently, during his routine September 22, 2025 check-in with ICE, he was detained without prior warning and served with a Notice of Revocation of Release.  ECF No. 1, ¶ 19; ECF No. 10-2, at 2-3.  The Notice of Revocation states that Lam's supervision has been revoked "made based on a review of your official alien file and a determination that there are changed circumstances in your case, specifically that ICE is acquiring a travel document on your behalf and your removal is now imminent."  ECF No. 10-2 at 2.  The Notice further states Lam must cooperate "with ICE's efforts to remove you by taking whatever actions ICE requests to affect your removal."  *Id.*  Lam was then transferred to Moshannon Valley Processing Center.  ECF No. 1, ¶20.  On November 16, 2025, Lam was transferred to the

Miami Correctional Center in Bunker Hill, Indiana, where he remains in ICE custody. ECF No. 3; ECF No. 13-1, ¶3. *see also* https://locator.ice.gov/odls/#/results (last viewed 2/23/2026).

As of February 6, 2026, Respondents had not prepared the necessary travel document application package necessary for the Vietnam Consulate to determine whether Lam meets the 2020 MOU eligibility criteria. ECF No. 19-1, ¶ 4.

## II. Procedural History

On November 7, 2025, Lam, through counsel, filed the instant Petition for Writ of Habeas Corpus, with exhibits. ECF No. 1. Respondents filed an opposition, with various exhibits, ECF No. 10, to which Lam filed a Reply Memorandum, with additional exhibits. ECF No. 13. Respondents then filed Supplemental Exhibits, ECF No. 19, which included a declaration from Deportation Officer Christopher J. Wiet confirming, contrary to Respondents' initial position,[4] Lam had in fact completed and submitted the required travel document application on December 8, 2025, but, through no fault of Lam's, the completed application had not been routed to the appropriate database until about six weeks later on January 21, 2026. ECF No. 19-1, ¶ 3. Further, as of February 6, 2026, ICE Enforcement and Removal

---

[4]    Initially, Respondents argued Lam had twice been provided a travel document application and Lam had not returned either. ECF No. 10, at 9. Respondents also stated, "once Lam completes the travel document application and returns it to ERO, the application can be submitted to the Vietnamese consulate." *Id.* In response, Lam submitted an Affidavit representing he completed the first application while detained at MVPC and deposited it in the ICE mailbox on October 7, 2025. ECF No. 13-1, ¶ 1. The second application was given to him on November 12, 2025, he completed the travel document application and hand-delivered the second application to a deportation officer on December 8, 2025. ECF No. 13-1, ¶ 5.

7

Operations ("ERO") was "still in the process of utilizing Petitioners travel document application to create a travel document application package that can be submitted to the Vietnam Consulate, in order that travel documents can be received for this Petitioner's removal from the United States." *Id.*, ¶ 4. Respondents also provided a copy of the January 21, 2026, 90-day custody review decision which notably states Lam's custody status had been reviewed and "ICE has determined to maintain your custody because: Your release will pose a danger to the community, to the safety of other persons or to property." ECF No. 19-2. It appears Respondents are no longer justifying Lam's continued detention on the basis that removal is significantly likely within the reasonably foreseeable future, but rather have changed their justification to rely on criminal activity which occurred in 1992, thirty-four years ago.

Lam was further advised that to assist in his ERO Removal Division custody review, he will be afforded a personal interview and that he and his representative will be notified of the date and time of the interview approximately 30 days prior to the scheduled interview date. *Id.* Lam filed a response to the supplemental filing. ECF No. 20.

### III. Discussion

Title 28, United States Code, § 2241, allows a court to grant a writ of habeas corpus to a prisoner held "in violation of the Constitution or laws or treaties of the United States[.]" *Id.*, § 2241(c)(3). This Court has jurisdiction to hear the merits of this case under that statute. *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) ("We conclude that § 2241 habeas corpus proceedings remain available as a forum for

8

statutory and constitutional challenges to post-removal-period detention."). *See also Roe v. Oddo*, No. 3:25-cv-128, 2025 WL 1892445, at *4 (W.D. Pa. July 9, 2025), *reconsideration denied*, 2025 WL 3030692 (W.D. Pa. Oct. 30, 2025) (holding that 8 U.S.C. § 1252(g) did not strip the court of jurisdiction since it was "examining the contest of Petitioner's detention" and not "reviewing Petitioner's removal order.").

  A. ***Zadvydas* and the Statutory/Regulatory Framework for Post-Removal Order Detention**

The parties agree Lam is being detained under the post-removal detention provision of the Immigration and Nationality Act, codified at 8 U.S.C. § 1231(a), which states, in pertinent part:

> [(1)(A)] Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").
> . . .
>
> [(2)(A)] During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.
> . . .
>
> [(6)] An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

The text of § 1231(a)(6) does not contain an express limit on the duration a noncitizen can be detained under its authority. But in *Zadvydas*, the Supreme Court outlined the due process concerns that would be implicated by a statute permitting indefinite detention. 533 U.S. at 690-96. "Indefinite, perhaps permanent, detention" is not authorized. *Id.* at 699. To the contrary, the Supreme Court found that interpreting the statute to allow for indefinite duration would raise "a serious constitutional threat[.]" *Id.*

Thus, in *Zadvydas*, the Supreme Court interpreted Section 1231(a)(6) to limit post-removal order detention to a period "reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689. As the Court found, a post-removal order detention period of six months was "presumptively reasonable[;]" however, beyond those six months, if removal no longer is reasonably foreseeable, continued detention becomes unauthorized. *Id.* at 701.

"After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* Thus, an alien is not necessarily entitled to release at the conclusion of six months of post-removal order detention. Instead, the Department of Homeland Security may continue detention until no significant likelihood of removal in the reasonably foreseeable future exists. *Id.*

While *Zadvydas* at first blush may seem to conclusively foreclose a habeas petition filed by a petitioner who has been detained for less than six months,

10

multiple courts have concluded the six-month presumption is rebuttable and not a prohibition against challenging detentions less than six months. *See Gurung v. Warden, S. Texas Ice Processing Ctr.,* No. SA-25-CA-01614, 2026 WL 93145, *6 (W.D. Tex. Jan. 6, 2026) ("*Zadvydas* recognized a "presumptively"—not categorically—reasonable period of detention."); *Ndandu v. Noem*, No. 3:25-CV-02939, 2026 WL 25848, *3-4 (S.D. Cal. Jan. 5, 2026 (holding the *Zadvydas* six-month presumptive period is rebuttable) (collecting cases); *Abrego Garcia v. Noem,* No. 8:25-CV-02780, --- F. Supp. 3d ---, 2025 WL 3545447, at *14 (D. Md. Dec. 11, 2025) ("But it is a presumption which can be rebutted where the petitioner demonstrates that removal is not reasonably foreseeable."); *Zavvar v. Scott*, Civ. No. 25-2104, 2025 WL 2592543 at *5 (D. Md. Sept. 8, 2025) (collecting cases). *See also Clark v. Martinez*, 543 U.S. 371, 387 (2005) (O'Connor, J., concurring) ("[T]he 6-month presumption we described in *Zadvydas* . . ., is just that – a presumption.").

This Court agrees with the reasoning of these courts and concludes the *Zadvydas* six-month presumption is rebuttable and is not a prohibition against challenging detentions less than six months. With that said, however, a petitioner who brings a claim before the six-month period lapses bears a heavier burden in demonstrating relief should be granted. *Munoz-Saucedo v. Pittman*, 789 F. Supp. 3d 397, 395-398 (D.N.J. 2025). In that situation, the government bears *no* burden to justify detention, and the petitioner must claim *and prove*, that his removal is not reasonably foreseeable. *Id.* (explaining the *Zadvydas*' six-month "presumption of reasonableness is the default, but if a person 'can prove' that his removal is not

11

reasonably foreseeable, then he can overcome that presumption. . . . *In practical terms, before the six-month period elapses, the government bears no burden to justify detention, and the petitioner must claim and prove, that his removal is not reasonably foreseeable.*" (internal citations and quotations omitted) (emphasis added).

Here, Lam has been re-detained since September 22, 2025, over 5 months yet a period less than the presumptively reasonable six-month detention period. He argues his 90-day removal period and his six-month presumptively reasonable period of detention "passed decades ago." ECF No. 1, ¶ 40. This argument centers on Lam's contention the fragmented periods of time he spent in ICE detention after the issuance of the final order of removal on November 13, 2001, but before his current custody commenced, should be aggregated with the time he has spent in custody since his re-detention on September 22, 2025. Only by doing so does his detention extend beyond the *Zadvydas* presumptively reasonable six-month detention period.

Respondents contend Lam's calculations are incorrect. "[A]ssum[ing] arguendo that Lam's re-detention did not start an additional 6-month presumptively reasonable period under *Zadvydas*," "following his re-detention on September 22, 2025, his 180-day (6-month) presumptively reasonable period would not have elapsed until at least . . . November 29, 2025."[5] ECF No. 10 at 8 and n.3.

---

5   At the time Lam filed his Petition, he had been re-detained in ICE custody for 46 days.

But no matter how the detention period is calculated, Respondents argue Lam "cannot carry his burden of establishing good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future." ECF No. 10 at 8.

Neither the Supreme Court nor the Court of Appeals for the Third Circuit has ruled on whether courts should aggregate nonconsecutive detention periods. And this Court need not make that determination here. Because, as explained below, the Court concludes, even assuming Lam's detention is less than six months, he has met his heavier burden and has proven his removal is not reasonably foreseeable.

### B. Lam's Detention Presents Prolonged and Indefinite Detention in Violation of his Due Process Rights Under *Zadvydas*[6]

At the time of the issuance of this Memorandum Opinion, Lam has been re-detained approximately 154 days (or 5 months, 1 day). The Court finds Lam has met his heavy burden and has proven his removal is not reasonably foreseeable. First, Lam provides a sworn declaration from Tin Thanh Nguyen, an immigration attorney who specializes "in immigration and deportation cases involving Vietnamese citizens." ECF No. 13-5, ¶ 5. Through his practice, he is "familiar with

---

[6] Because the Court has concluded Lam's detention is in violation of his due process rights under *Zadvydas* and is ordering he be returned to supervised release status, the Court need not address Lam's second argument that Respondents' failure to comply with procedural requirements for revoking immigration-related also entitles him to be returned to supervised release status.

13

the process and challenges involved in security travel documents for pre-1995 arrivals to the United States." *Id.*, ¶ 6. Attorney Nguyen attests:

> 7. The process for the government of Viet Nam to issue a travel document often takes many months to complete because it involves both the Ministry of Foreign Affairs ("MOFA") and Ministry of Public Security ("MPS"). Once the MOFA receives an official request for a travel document from ICE, the information is forwarded to the MPS so that the local police can conduct interviews and site-visits with their respondent's relatives in Viet Nam. Only when this process is complete will the MPS issue the travel document for repatriation to Viet Nam.
>
> 8. With respect to applications for passports or other travel documents from the Vietnamese Embassy, the most challenging client matters involved those clients who immigrated to the United States before 1995, typically as refugees from armed conflict that occurred in Southeast Asia during the 1970s and 1980s ("Pre-1995 arrivals").
>
> 9. Through years of interactions with staff at the Vietnamese Embassy, I have learned that the Vietnamese government subjects passport or travel document applications made by Pre-1995 arrivals to substantial vetting, particularly those without Vietnamese birth certificates, to ensure that each applicant has a legitimate claim to Vietnamese citizenship and the right to return to Viet Nam. This vetting process includes an investigation by the MPS into the location of each applicant's last known address while living in Viet Nam - through site visits - and into the identity of each applicant's surviving relatives in Vietnam - through interviews, information which each applicant must provide when requesting a passport or travel document.
>
> . . .
>
> 11. For many Vietnamese nationals, especially the ones who entered the United States prior to 1995, the process to decide whether to issue travel documents takes even longer since many people no longer have any relatives in Viet Nam who can verify their identity, or they do not have documentation from Viet Nam at all.

> 12. As a result of the in-depth investigation required by the Vietnamese government before issuing passports or travel documents to Pre-1995 arrivals, the process of applying for these documents usually takes a long time.
>
> 13. Moreover, in light of the Vietnamese government's highly individualized process for processing passport or travel document requests for Pre-1995 arrivals, the likelihood that the Vietnamese government will approve a particular Pre-1995 arrival's request is unknown.
>
> 14. To further complicate matters, in my experience when an application fails to pass this substantial vetting process, the Vietnamese government will not issue a formal denial of the application but rather will take no action and, in doing so, will in effect be an informal denial.
>
>                   . . .

ECF No. 13-5.

Next, Lam points out he has requested travel documents from Vietnam on three occasions, and Vietnam has refused to issue him travel documents as recently as 2024. *See* ECF No. 1-4, at 1-3. In his Affidavit, Lam avers, "I have made every effort to comply with immigration authorities and resolve my situation. I wrote letters to the Vietnamese Embassy requesting travel documents but never received a response. I even attempted to appear in person at the embassy, but I was denied entry." ECF No. 1-1, ¶ 7. According to the Affidavit of Attorney Nguyen, it is common for the Vietnamese government to take no action when an application fails to pass the vetting process. ECF No. 13-5, ¶ 14.

Third, Lam has shown he does not meet all the conditions for eligibility under the 2020 MOU. He has no claim to citizenship in Vietnam or any other country and

15

Respondents have recognized him as a "stateless individual." *See* ECF No. 13-2 ("Country of Nationality – Stateless"); ECF No. 13-3 ("You are a native of Vietnam and you are stateless."); ECF No. 13-4 ("Country of Citizenship – Stateless"). He did not reside in Vietnam prior to arriving in the United States, but lived in Macau and the Philippines. ECF 1-1, ¶ 3 ("We spent approximately 18 months in a refugee camp in Macau and another year in the Philippines before resettling in the United States as refugees."). The Vietnamese government has never recognized him as a citizen and he has no family, connections, or identity in Vietnam. ECF No. 1-1, ¶ 5.

Fourth, Lam as shown the Respondents' reliance on the 2020 MOU is not sufficient to support their assertion of "changed circumstances" to support re-detention of Lam. *See* ECF No. 13 at 9. As multiple courts have noted, the 2020 MOU "is not enough to show there is a significant likelihood that Petitioner will be removed to Vietnam because the memorandum does not mandate that Vietnam will accept Petitioner." *Hoac v. Becerra*, No. 2:25-CV-01740, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025). *See also* ECF No. 13 at 9 (citing cases). "Vietnam has total discretion whether to issue a travel document to any individual." *Hoac*, 2025 WL 1993771, at *4. Hence, "the 'memorandum of understanding' alone does not appear to be sufficient to show a significant likelihood Petitioner may be removed in the reasonably foreseeable future." *Id*. (citing 8 § 241.13(i)(2)). And while Respondents have provided a publicly available document entitled "U.S. Immigration and Customs Enforcement Removal Statistics," which reflects that since FY 2021 the United States has removed 157 individuals whose country of

16

citizenship was Vietnam, ECF No. 10-4 at 2, the Court finds this document provides minimum, if any, support to show the likelihood of Lam's removal. At best, the document establishes Vietnam has accepted 157 citizens for repatriation since FY 2021; but the document fails to provide any information indicating whether Vietnam accepted these individuals under the 2020 MOU.

Finally, although the September 22, 2025, Notice of Revocation of Release stated, "ICE is *acquiring* a travel document on your behalf *and your removal is now imminent*," ECF No. 10-2 at 2 (emphasis added), the Declaration of Deportation Officer Christopher J. Wiet reveals that as of February 6, 2026 - five months after the Notice of Revocation of Release advised ICE is "acquiring a travel document", ECF No. 10-2 at 2, four months after Lam submitted a travel application in October of 2025, 13-1 at ¶¶ 1, and two months after he completed a second application in December of 2025, ECF 5; ECF No. 1-1 at 19-1, ¶ 3 - "ERO is still in *the process* of utilizing the Petitioner's travel document application to create a travel packet that can be submitted to the Vietnam Consulate, in order that travel documents can be received for this Petitioner's removal from the United States." ECF No. 19-1, ¶ 4 (emphasis added). As is the case here, "[t]he fact that Respondents intend to complete a travel document request for Petitioner does not make it significantly likely he will be removed in the foreseeable future." *Hoac,* 2025 WL 1993771, at *4.

For all these reasons, Lam's evidence has shown that the process for procuring travel documents from Vietnam for pre-1995 immigrants remains uncertain and protracted. The evidence of record reveals Respondents are no closer

17

to removing Lam than they were in 2001.  Accordingly, the Court concludes, even under the higher standard, Lam has met his burden and has proven he faces "indefinite and potentially permanent" detention.  *Zadvydas,* 533 U.S. at 696.  The petition for writ of habeas corpus will therefore be granted and Respondents will be directed to release Lam from custody subject to and in accordance with the conditions of his preexisting Order of Supervision.  An appropriate Order follows.

DATED this 23rd day of February, 2026.

BY THE COURT:

s/Christopher B. Brown
Christopher B. Brown
United States Magistrate Judge


cc:     All Counsel of Record
        via ECF electronic notification